# State of New York Court of Appeals

OPINION

This opinion is uncorrected and subject to revision before publication in the New York Reports.

No. 81
In the Matter of Rochester Police
Locust Club, Inc., et al.,
  Respondents,
   v.
City of Rochester, et al.,
  Respondents,
Council of City of Rochester,
  Appellant.

Andrew G. Celli, Jr., for appellant.
Daniel P. DeBolt, for respondents Rochester Police Locust Club, Inc. et al.
City of Kingston; City of New York; Albany Community Police Review Board, amici curiae.

EGAN JR., J.:

  Since the 1980s, the collective bargaining agreement (hereinafter CBA) in place between the City of Rochester and the Rochester Police Locust Club, Inc. (hereinafter the

Locust Club), the union representing police officers in the City, has governed the procedure for disciplining police officers. In 2019, the Council of the City of Rochester adopted, the Mayor of the City of Rochester signed, and voters approved via referendum, Local Law No. 2, which created the Police Accountability Board (hereinafter PAB), a body of nine City residents whose powers included the exclusive authority to "investigate and make determinations respecting" any police officer accused of misconduct. That authority included the power to conduct a hearing on the alleged misconduct and to impose disciplinary sanctions, up to and including dismissal, if the officer were found guilty. The City's police chief was free to impose additional punishment upon that officer, but was obliged at a minimum to implement the sanction determined by the PAB.

There is no dispute that the disciplinary procedures set forth in Local Law No. 2 deviated in significant respects from the agreed-upon procedures set forth in the CBA then in effect and that they were not agreed to by the Locust Club. The Locust Club and others commenced this combined CPLR article 78 proceeding and declaratory judgment action to challenge Local Law No. 2 and, in particular, its transfer of police disciplinary authority to the PAB. Supreme Court ultimately granted the petition in part and held, among other things, that Local Law No. 2 was invalid to the extent that it transferred that authority. Upon the City Council's appeal, the Appellate Division affirmed (196 AD3d 74 [4th Dept 2021]). The Appellate Division held that the City was obliged to negotiate with the Locust Club on the issue of police discipline because in 1985 it had repealed the provision of its charter vesting a local official in charge of the police force with unilateral authority over police discipline and that the City's effort to revive that authority in Local Law No. 2

necessarily failed under the Municipal Home Rule Law because it was inconsistent with a general law, namely, "the Taylor Law's mandate of collective bargaining for police discipline" (196 AD3d at 84). We granted the City Council's motion for leave to appeal and now affirm.

I.

In 1907, the Legislature enacted the Charter of the City of Rochester (*see* L 1907, ch 755 [hereinafter 1907 City Charter]). The 1907 City Charter specified that the City's department of public safety would contain several bureaus, including the police bureau, and granted the commissioner of public safety, among other things, "cognizance, jurisdiction, supervision and control of the police bureau, . . . [including] the officers and members thereof" (1907 City Charter § 317). The commissioner was further granted, in a provision entitled "[c]harges and trials of policemen and firemen," exclusive power "to hear, try and determine" disciplinary charges against a police officer "according to the rules made by [the commissioner] in relation to such matters" (1907 City Charter § 330). The commissioner was free to impose a range of penalties, up to and including dismissal, upon an officer if he or she were found guilty of misconduct, and the commissioner's decision was "final and conclusive, and not subject to review by any court" (1907 City Charter § 330).

The State Constitution was amended in 1923 to provide for municipal home rule, and those home rule powers were implemented via the former City Home Rule Law and, later, the Municipal Home Rule Law (*see e.g. Hausser v Giunta*, 88 NY2d 449, 451 [1996]; *New Rochelle Trust Co. v White*, 283 NY 223, 229 [1940]). The City exercised those home

rule powers on several occasions over the ensuing decades to amend the provisions of its charter governing the administrative structure of the police force. The charter nevertheless retained – eventually in a section 8A-7 of the charter entitled "[c]harges and trials of policemen" – a provision vesting the official responsible for administering the police force with exclusive disciplinary authority over police officers.[1] In 1985, however, Local Law No. 2 of 1985 was enacted as part of a restructuring plan and repealed section 8A-7, explicitly stating that the provision was no longer necessary because the "subject matter is covered in the Civil Service Law."

The questions presented here revolve around the effect of that 1985 repeal and whether it rendered police disciplinary procedures an appropriate subject of collective bargaining in the City.

## II.

This case is the latest of a series in which we have addressed the issue of when police disciplinary procedures are subject to collective bargaining. Briefly, in 1958, the Legislature enacted Civil Service Law §§ 75 and 76 to specify "the procedures for disciplining public employees, including police officers, . . . [and] provide for a hearing and an appeal" (*Matter of Patrolmen's Benevolent Assn. of City of N.Y., Inc. v New York State Public Empl. Relations Bd.*, 6 NY3d 563, 573 [2006]). "[A]lthough Civil Service Law

---

[1]  The fact that the charter was amended in various respects prior to 1985 to change the administrative structure of the City's police force is "irrelevant for our purposes," as those alterations never disturbed the disciplinary authority granted by the Legislature in 1907 (*Matter of City of Schenectady v New York State Pub. Empl. Relations Bd.*, 30 NY3d 109, 115 n 1 [2017]).

§§ 75 and 76 generally govern police disciplinary procedures, preexisting laws that expressly provide for control of police discipline were 'grandfathered' under Civil Service Law § 76 (4), which provides that nothing in sections 75 and 76 'shall be construed to repeal or modify any general, special or local' laws or charters" (*Matter of City of Schenectady v New York State Pub. Empl. Relations Bd.*, 30 NY3d 109, 114 [2017], quoting *Matter of Patrolmen's Benevolent Assn. of City of N.Y., Inc.*, 6 NY3d at 573).

Thereafter, the Taylor Law was enacted in 1967 to enshrine "the 'strong and sweeping' public policy in favor of collective bargaining in this state" and require good faith bargaining between recognized employee organizations and public employers over the terms and conditions of employment (*Matter of City of Long Beach v New York State Pub. Empl. Relations Bd.*, 39 NY3d 17, 22 [2022], quoting *Matter of City of Watertown v State of N.Y. Pub. Empl. Relations Bd.*, 95 NY2d 73, 78 [2000]; *see* Civil Service Law § 200 *et seq.*, as added by L 1967, ch 392; *Matter of City of Schenectady*, 30 NY3d at 114). Although the disciplinary procedures set forth in Civil Service Law §§ 75 and 76 predate the Taylor Law, we have previously "held that the policy of the Taylor Law prevails, and collective bargaining is required [for disciplinary procedures], where no legislation specifically commits police discipline to the discretion of local officials" (*Matter of Patrolmen's Benevolent Assn. of City of N.Y., Inc.*, 6 NY3d at 571; *see Matter of Auburn Police Local 195, Council 82, Am. Fedn. of State, County & Mun. Empls., AFL-CIO v Helsby*, 62 AD2d 12 [3d Dept 1978], *affd for reasons stated below* 46 NY2d 1034 [1979]).

This Court's prior decisions have also addressed the situation where a law grandfathered under Civil Service Law § 76 (4) gives rise to a conflict "between the strong

and sweeping policy of the State to support collective bargaining under the Taylor Law and a competing policy . . . favoring strong disciplinary authority for those in charge of police forces" (*Matter of Patrolmen's Benevolent Assn. of City of N.Y., Inc.*, 6 NY3d at 571 [internal quotation marks and citation omitted]; *see Matter of City of Schenectady*, 30 NY3d at 114; *Matter of Town of Wallkill v Civil Service Empls. Assn., Inc. [Local 1000, AFSCME, AFL-CIO, Town of Wallkill Police Dept. Unit, Orange County Local 836]*, 19 NY3d 1066, 1069 [2012]). We have resolved that tension by holding that the specific goal of strong disciplinary authority for the leader of a police force prevails over the general one of supporting collective bargaining and that, where "legislation specifically commit[ting] police discipline to the discretion of local officials . . . is in force, the policy favoring control over the police prevails, and collective bargaining over disciplinary matters is prohibited" (*Matter of Patrolmen's Benevolent Assn. of City of N.Y., Inc.*, 6 NY3d at 571-572; *see Matter of City of Schenectady*, 30 NY3d at 115; *Matter of Town of Wallkill*, 19 NY3d at 1069).[2] To put it simply, "some [municipalities] have the right to bargain about police discipline, and some do not" (*Matter of City of Schenectady*, 30 NY3d at 118), and the difference depends upon whether there is applicable legislation "specifically commit[ting] police discipline to the discretion of local officials . . . in force" (*Matter of Patrolmen's Benevolent Assn. of City of N.Y., Inc.*, 6 NY3d at 571-575).

IV.

---

[2] Our prior decisions address the circumstances under which police discipline could become a prohibited subject of bargaining; we note that the Legislature recently acted to ensure that the same rule would not be extended to the discipline of firefighters (*see* L 2022, ch 674).

Applying those principles here, the parties are in agreement that section 330 of the 1907 City Charter constituted prior legislation committing police discipline to the discretion of the City official in charge of the police force which was grandfathered under Civil Service Law § 76 (4). The provision would have prohibited collective bargaining over police disciplinary procedures had it remained "in force" (*Matter of Patrolmen's Benevolent Assn. of City of N.Y., Inc.*, 6 NY3d at 572). That said, the Municipal Home Rule Law expressly vests the City with the power to "revise and amend its charter by local laws that are not inconsistent with the constitution or general law" (*Matter of St. Lawrence County v City of Ogdensburg*, 40 NY3d 121, 126 [2023]; *see* Municipal Home Rule Law § 10 [1] [ii] [c] [1]), as well as the power to "adopt and amend local laws not inconsistent with the provisions of the constitution or not inconsistent with any general law relating to its property, affairs or government" (Municipal Home Rule Law § 10 [1] [i]). It is further established that the City could exercise that power in a way that surrendered authority granted to it under the 1907 City Charter; indeed, as the City itself points out, a referendum was required to approve Local Law No. 2 of 2019 precisely because that law "[a]bolishe[d], transfer[red] or curtail[ed]" the charter power of the Mayor to appoint and remove all members of boards (Municipal Home Rule Law § 23 [2] [f]).

The City Council exercised that authority when it adopted Local Law No. 2 of 1985 with the explicit aim of repealing the provision in its charter governing "[c]harges and trials of policemen, for the reasons that this subject matter is covered in the Civil Service Law." The plain meaning of that language rendered the disciplinary provisions of Civil Service Law §§ 75 and 76 applicable and, "where Civil Service Law §§ 75 and 76 apply, police

discipline may be the subject of collective bargaining" (*Matter of Patrolmen's Benevolent Assn. of City of N.Y., Inc.*, 6 NY3d at 573). Indeed, it is notable that the Taylor Law itself is a part of the Civil Service Law and had been operative for almost two decades before the City enacted Local Law No. 2 of 1985 and specified that "the Civil Service Law" would thereafter govern police discipline. The City Council suggests that it did not intend for the 1985 law to require the City to collectively bargain police discipline but, even accepting that its intent is relevant in view of the plain text of the law itself, there is no evidence in the record to support that claim. In any event, by 1985 the case law was clearly established that police discipline was a proper subject of collective bargaining where the procedures of Civil Service Law §§ 75 and 76 applied, and the City Council certainly should have been aware of that fact (*see Matter of Town of Greenburgh [Police Assn. of Town of Greenburgh]*, 94 AD2d 771, 771-772 [2d Dept 1983], *lv denied* 60 NY2d 551 [1983]; *Matter of Auburn Police Local 195*, 62 AD2d at 17). It follows that, upon the enactment of Local Law No. 2 of 1985, there was no longer a conflicting charter provision in force that "specifically commit[ted] police discipline to the discretion of local officials"; therefore, "the policy of the Taylor Law prevail[ed], and collective bargaining [was] required" on the issue of police discipline (*Matter of Patrolmen's Benevolent Assn. of City of N.Y., Inc.*, 6 NY3d at 571).

Having surrendered the grant of police disciplinary power embodied in the 1907 City Charter in 1985, the attempt in Local Law No. 2 of 2019 to give exclusive disciplinary power to the PAB without the Locust Club's agreement necessarily fails. Even if the City Council had attempted to repeal Local Law No. 2 of 1985 before enacting the 2019 Local

Law, it could not have revived the authority granted under the 1907 City Charter because "[t]he repeal . . . of any provision of a statute, which repeals any provision of a prior statute, does not revive such prior provision" (General Construction Law § 90). Local Law No. 2 of 2019 was instead a new effort to reassert local control over police discipline and vest the PAB with that power, but such an effort clashes with the statewide disciplinary provisions set forth in Civil Service Law §§ 75 and 76 and, importantly, does not qualify as a pre-existing "general, special or local law or charter provision" excluded from the scope of those sections by Civil Service Law § 76 (4). Local Law No. 2 of 2019 therefore exceeded the City's power "to adopt and amend local laws not inconsistent with the provisions of the constitution *or not inconsistent with any general law relating to its property, affairs or government*" (Municipal Home Rule Law § 10 [1] [i] [emphasis added]; *see* Municipal Home Rule Law §§ 10 [1] [ii] [c] [1]; 22), as it ran afoul of the disciplinary procedures imposed by Civil Service Law §§ 75 and 76 and the Taylor Law that rendered those procedures proper subjects of collective bargaining. It follows that the portion of Local Law No. 2 of 2019 addressing police discipline does exceed the City's authority under the Municipal Home Rule Law and is invalid.

V.

Finally, even if the City could rely upon the policy articulated in now-repealed section 330 of the 1907 City Charter to justify the passage of Local Law No. 2 of 2019 – conducting a legislative séance to summon that policy "as a ghost after the provision of law embodying it has been repealed" (brief for amicus curiae City of New York, at 16 n 7) – the effort to do so would suffer from an additional flaw. If the State's 1907 policy

judgment that authority for police discipline should rest exclusively with the City official in charge of the police department was so strong that it overcame even the more recently enacted statewide policy embodied in the Taylor Law, then the City necessarily also lacked the authority, in 2019, to contravene that policy judgment by shifting disciplinary authority to a new, all-civilian PAB. As the Appellate Division put it:

> "If, as the current City Council insists, the [L]egislature's 1907 policy determination to commit police discipline to the exclusive discretion of the executive branch was so important and fundamental that it barred the 1985 City Council from subjecting police discipline to collective bargaining, then the paramount import of that 1907 policy would also logically bar the current City Council from transferring the executive's latent disciplinary authority to an unelected body like PAB. Simply stated, the 1907 City Charter provision cannot logically preclude collective bargaining of police discipline yet simultaneously permit an independent board to fire police officers over the objection of the executive's appointed police chief.  The very rationale that the City Council deploys to invalidate the 1985 repeal would equally doom its own 2019 legislation.  Thus, by winning the battle over the validity of the 1985 repeal, the City Council would ineluctably lose the war over the validity of the 2019 local law" (196 AD3d at 83-84).

There are obvious differences between the all-civilian PAB and a police chief, police commissioner or public safety commissioner. The exemption from collective bargaining over police discipline, as we recognized in cases like *Matter of Patrolman's Benevolent Assn. of City of New York*, is based on a public "policy favoring strong disciplinary authority *for those in charge of police forces*" (6 NY3d at 571 [internal quotation marks and citation omitted]). We justified our recognition of that exemption, in part, based on the "quasi-military nature of a police force" and our understanding "that a

question pertaining solely to the general government and discipline of the force . . . must, from the nature of things, rest wholly in the discretion of the commissioners" (*id.* at 576 [internal quotation marks omitted]). Local Law No. 2 reflects a wholly different and contradictory policy judgment, namely, that the public interest is best served when the local officials generally in charge of police departments are *not* in charge of police discipline. Neither the City Council nor the dissent cite any State legislative enactment embodying that public policy.

It may, or may not, be the popular will in this State to transfer the power over police discipline away from officials in charge of police forces – and some would argue that such a transfer of power is good public policy – but even those who favor that policy must admit that the Legislature has not acted to implement it. Although this Court has previously "recognized that there may be general public policy limitations on collective bargaining that are not derived from statute," we have emphasized that such must be a rare occurrence because "a public policy strong enough to [prevail over the strong presumption in favor of collective bargaining created by the Taylor Law] would 'almost invariably involv[e] an important constitutional or statutory duty or responsibility'" (*Matter of Board of Educ. of City School Dist. of City of N.Y. v New York State Pub. Empl. Relations Bd.*, 75 NY2d 660, 667-668 [1990], quoting *Matter of Port Jefferson Sta. Teachers Assn. v Brookhaven-Comsewogue Union Free School Dist.*, 45 NY2d 898, 899 [1978]). As such, we have stated that "[t]he presumption in favor of bargaining may be overcome only in special circumstances where the legislative intent to remove the issue from mandatory bargaining

is plain and clear, or where a specific statutory directive leaves no room for negotiation" (*Matter of City of Watertown v State of New York Pub. Empl. Relations Bd.*, 95 NY2d at 78-79 [internal quotation marks and citations omitted]; *see Matter of City of Long Beach v New York State Pub. Empl. Relations Bd.*, 39 NY3d 17, 22 [2022]). The Legislature may therefore act to articulate a public policy that would prevail over the "strong and sweeping" one favoring collective bargaining that it has already adopted in the Taylor Law (*id.* at 78 [internal quotation marks omitted]) and, if it does so, this Court will enforce that policy just as stringently as we have the one set forth in the Taylor Law. Absent such action by the Legislature, however, the statewide policy in favor of collective bargaining must control.

Accordingly, the order of the Appellate Division insofar as appealed from should be affirmed, with costs.

WILSON, Chief Judge (dissenting):

In the wake of the killings of Eric Garner, Akai Gurley, Tamir Rice, Calvon Reid, Anthony Hill, Eric Harris, Dontay Ivy, Walter Scott, Greg Gunn, Deravis Rogers, Jordan Edwards, Dennis Plowden, Stephon Clark, Chinedu Okobi, George Robinson, Jimmy

Atchison, Javier Ambler, Tyan Twyman, Cameron Lamb, William Howard Green, Manuel

Ellis, Breonna Taylor, Daniel Prude, George Floyd, Andre Hill, Calvin Wilks, Jr., Quadry

Sanders, Jayland Walker, Ta'Kiya Young, and approximately 9,000 other people by police

officers since 2015,[1] cities around the country have taken steps to make police officers

more accountable to the public they serve by altering the method of police discipline.

Rochester, New York, recognizing the need for change even before the 2020 killing of Mr.

Prude by its police force, joined ongoing reform efforts by creating an independent board

to oversee complaints of police misconduct.[2]  Rather than being handled internally within

---

[1] *See, e.g., Police Shootings Database*, The Washington Post, https://www.washingtonpost.com/graphics/investigations/police-shootings-database [Oct. 27, 2023].

[2] The importance of civilian oversight of law enforcement is widely recognized (*see* Final Report of the President's Task Force on 21st Century Policing 26 [2015] ["Some form of civilian oversight of law enforcement is necessary in order to strengthen trust with the community"]; Udi Ofer, *Getting It Right: Building Effective Civilian Review Boards to Oversee Police*, 46 Seton Hall L Rev 1033, 1040-42 [2016] [noting the existence of hundreds of civilian review boards, and tracing the genesis of such boards to Civil Rights Movement challenges to police brutality]). Due in part to the inability of existing practices to prevent the killings mentioned above, demands for such oversight have strengthened in recent years to demand that civilians have meaningful control over police discipline, rather than merely a nominal or advisory role (*e.g.* Jocelyn Simonson, *Police Reform Through A Power Lens*, 130 Yale LJ 778, 813-824 [2021] [describing activist demands for such control in Chicago, Oakland, Nashville, and other locations]).

In New York, 2020 protests over the killing of George Floyd sparked the City of Albany to pass 2021 Local Law J, which transformed a preexisting civilian review board by granting it the power to conduct independent investigations and issue subpoenas (Albany Community Police Review Board, *About Us*, https://www.albanycprb.org/about-us [last accessed November 3, 2023]). New York City enacted Local Law No. 24-2022, which empowered its Civilian Complaint Review Board to initiate complaints even if no victim comes forth with a formal accusation. Buffalo has also strongly considered the creation of such a Board (Deidre Williams, The Buffalo News, *Some Still Press For Buffalo Police Review Board. Others Vow to "Exhaust Every Resource to Fight It,"*

the police department or submitted to arbitration, such complaints would now be investigated by a board largely nominated by community organizations and appointed by the City Council, improving "accountability and transparency" (Rochester Local Law No. 2-2019, §§ 18-1, 18-4 [H]).

The majority believes that Rochester had the ability to take this action until 1985 when, by repealing a portion of the charter New York State granted to Rochester in 1907, Rochester forever lost the ability to structure police discipline except as agreed to through collective bargaining with the Locust Club.  I disagree.  Fundamentally, the majority has allowed the inconclusive action of a bygone Rochester legislative body to displace the public policy of New York State, when the proper question is whether there is a *state* public policy that can overcome the Taylor Law mandate of collective bargaining. We have already held that there is such a policy; the remaining question is whether it applies on the facts present here.

The majority has lost the forest for the trees.  Whether a subject must be collectively bargained under the Taylor Law depends on state public policy, not the presence of a conflicting statute. The majority agrees that prior to 1985, state public policy prohibited collective bargaining over police discipline in Rochester, even though Rochester had been bargaining over police discipline for nearly a decade. Although the 1985 Rochester law

---

https://buffalonews.com/news/local/some-still-press-for-buffalo-police-review-board-others-vow-to-exhaust-every-resource-to/article_04e06eca-c500-11ed-9ccf-0b51c89e2290.html [April 6, 2023]). Our decision today creates an odd divide between cities which may pursue such reform and cities which may not, dependent on historical contingencies unrelated to the merits or demerits of the reforms themselves.

repealed certain statutory provisions relevant to police discipline, state policy governing the application of the Taylor Law cannot be altered by municipal legislation, especially municipal legislation that expresses no clear desire to forego the City's ability to unilaterally determine its own police disciplinary measures. Rather, the state policy favoring "strong disciplinary authority for those in charge of police forces" continues to apply to Rochester (*Matter of Patrolmen's Benevolent Assn of City of New York, Inc. v New York State Pub. Empl. Relations Bd.*, 6 NY3d 563, 571 [2006] [*PBA*]). Because Local Law No. 2-2019 aligns with that policy, there is no conflict here between state and local law— only between a modern policy consensus and equivocal 1985 municipal legislation. Because there is no reason to favor the latter over the former, I dissent.

## I.

The State granted a new charter to the City of Rochester in 1907 (L 1907, ch 755). Section 324 of that charter gave the Commissioner of Public Safety a duty to make "rules and regulations not inconsistent with this act and other laws of the state . . . for the government, discipline, management, and direction of the police." Section 330 gave the Commissioner the power to hear disciplinary proceedings against police officers and administer punishment, subject to certain due process protections.

Between 1925 and 1970, Rochester repeatedly amended its charter using its powers under the City Home Rule Law (L 1924, ch 363) and its successor, the Municipal Home Rule Law (L 1963, ch 843). Those amendments reorganized the police and fire departments but did not significantly alter the disciplinary provisions in the original charter. In 1958,

the State passed sections 75-76 of the Civil Service Law. However, Rochester's existing disciplinary procedures were grandfathered in under section 76(4) of that law. In 1967, the State passed the Taylor Law. According to Rochester's undisputed representation, the City and the Locust Club began collective bargaining over police discipline no later than 1976, with the agreement between the parties incorporating sections 75-76 of the Civil Service Law.

In 1985, Rochester passed Local Law No. 1-1985 and Local Law No. 2-1985. Local Law No. 1-1985 repealed the former section 8A-2 and replaced it with a new section 8A-1, stating that the chief of police, as deputy to the Commissioner of Public Safety, "shall, subject to the rules of the Commissioner of Public Safety, assign, station and transfer all personnel" and "see to it that the rules and regulations relating to the Police Department are enforced and carried out." The chief of police also had the authority to issue subpoenas and administer oaths. Local Law No. 2-1985 repealed section 8A-7, which described procedures for disciplinary proceedings, "for the reason that this subject matter is covered in the Civil Service Law."

In 2016, Rochester entered into a three-year collective bargaining agreement with the Locust Club. Article 20 of that agreement contains extensive procedures regarding discipline. Among other things, it mandates that serious disciplinary charges will be heard by neutral hearing officers agreed on by the City and Locust Club.

In 2019, Rochester adopted Local Law No. 2-2019 via a referendum with 75% support. The purpose of Local Law No. 2-2019 was to increase community control over

police discipline. To this end, Local Law No. 2-2019 created a Police Accountability Board (PAB) composed of community leaders and political appointees with the power to investigate complaints received directly or referred from the chief of police and other city officials. After a hearing following the procedural requirements of Civil Service Law § 75, it may impose discipline according to a disciplinary matrix that it is required to create. The chief of police must impose at least the discipline recommended by the PAB, but can deviate upwards.

Local Law No. 2-2019 conflicts with the CBA because it contemplates discipline according to a different disciplinary process than the one contained in the CBA and uses different hearing officers than specified by the CBA. The Locust Club brought a hybrid Article 78 and declaratory judgment action seeking a declaration that Local Law No. 2-2019 is invalid because it conflicts with the Taylor Law, Civil Service Law § 75, and Unconsolidated Law § 891.

II.

Rochester argues that it is free to depart from the CBA procedures because police discipline is a prohibited subject of bargaining in Rochester under the Taylor Law. The majority's conclusion to the contrary rests on the proposition that bargaining can be prohibited under the Taylor Law only if bargaining would conflict with a statute "in force." That is not so. Whether the subject is teacher tenure, police hiring, or questioning of firefighters regarding criminal activity, our test for a prohibited subject has long been whether there is a *public policy*—not necessarily a statute—prohibiting bargaining (*e.g.*

*Matter of Susquehanna Val. Cent. School Dist. at Conklin v Susquehanna Val. Teachers'
Assn*, 37 NY2d 614, 616 [1975]; *Matter of Cohoes City School Dist. v Cohoes Teachers
Assn*, 40 NY2d 774, 778 [1976]; *Matter of Buffalo Police Benevolent Assn (City of
Buffalo)*, 4 NY3d 660, 664 [2005]; *Matter of City of New York v Uniformed Fire Officers
Assn*, *Local 854, IAFF, AFL-CIO*, 95 NY2d 273, 281 [2000] [collecting cases where where
"arbitration is prohibited on public policy grounds alone"]). We have repeatedly stated that
a public policy prohibiting bargaining can be "explicit or implicit in statute or decisional
law, or in neither" (*PBA*, 6 NY3d at 573, quoting *Matter of Cohoes City School Dist. v
Cohoes Teachers Assn.*, 40 NY2d 774, 778 [1976]). Just last year, we reiterated the
principle that "some subjects are excluded from collective bargaining as a matter of policy,
even where no statute explicitly says so" (*Matter of City of Long Beach v New York State
Pub. Empl. Relations Bd.*, 39 NY3d 17, 22 [2022]).

Our public policy test is derived from a concern with legislative intent, understood
not in terms of "how these enactments were intended by their authors" but in terms of our
desire to give voice to a coherent legislative policy (*PBA*, 6NY3d at 576; *see Matter of
Schenectady Police Benev. Assn v New York State Pub. Empl. Relations Bd.,* 85 NY2d 480,
486 [1995]; *Matter of City of Watertown v State of New York State Pub. Empl. Relations
Bd.*, 95 NY2d 73, 78-79 [2000]). Without a doubt, the policy of collective bargaining
announced by the Taylor Law is "strong and sweeping" (*Cohoes*, 40 NY2d at 778).
Nevertheless, we have recognized that there are areas where the legislature explicitly or
implicitly does not intend it to apply (*see Schenectady Police Benev. Assn*, 85 NY2d at

486). Some of those areas are marked off by conflicting statutes, but others have not been addressed by the legislature so clearly (*e.g. Matter of Buffalo Police Benevolent Assn.*, 4 NY3d at 664; *Matter of Board of Ed., Great Neck Union Free School Dist. V Areman*, 41 NY2d 527, 530 [1977]). Our standard therefore recognizes that the public policy of the state need not be drawn from a statute at all—much less from a local decision to exempt itself from an otherwise widespread state public policy.

Police discipline is no exception to our standard. Indeed, our pivotal case analyzing collective bargaining over police discipline, *Matter of Patrolmen's Benevolent Assn of City of New York, Inc. v New York State Pub. Empl. Relations Bd.* [*PBA*] (6 NY3d 563, 573 [2006]), contains some of our strongest statements that a policy prohibiting bargaining need not be derived from a particular statute. In *PBA*, we considered whether state statutes that vested the New York City police commissioner and Rockland Town Board with broad discretion over police discipline created a prohibition on bargaining under the Taylor Law (*PBA*, 6 NY3d at 570-71). Our opinion first cited several cases for the proposition that "some subjects are excluded from collective bargaining as a matter of policy, even where no statute explicitly says so" (*id.* at 572-73). We then reiterated the legal standard that bargaining is prohibited by "[p]ublic policy, whether derived from, and whether explicit or implicit in statute or decisional law, or in neither" (*id.* at 573, quoting *Matter of Cohoes City School Dist. v Cohoes Teachers Assn.*, 40 NY2d 774, 778 [1976]). Finally, we held that although the statutes in question did not explicitly prohibit bargaining over discipline, they expressed a policy of strong local authority over police discipline "so important that

the policy favoring collective bargaining should give way" (*PBA*, 6 NY3d at 575-76). Our overriding concern in *PBA* was to determine New York State's public policy regarding the application of the Taylor Law to police discipline, just as we do when analyzing prohibited subjects of bargaining in any other context.

Our subsequent cases have applied the holding of *PBA* without disturbing that underlying analysis (*see Matter of Town of Wallkill v Civ. Serv. Employees Assn, Inc.*, 19 NY3d 1066 [2012]; *Matter of City of Schenectady v New York State Pub. Empl. Relations Bd.*, 30 NY3d 109 [2017]). Those decisions observed that the state policy favoring local control over police discipline was widespread, applying to every town (*Wallkill*, 19 NY3d 1066) and every city of the second class (*Schenectady*, 30 NY3d 109) in addition to municipalities with charters and specific acts similar to those discussed in *PBA*.[3] It is a fair summary of these cases to say that state policy is for most municipalities to maintain discretionary control over police discipline rather than submitting such discipline to collective bargaining.

---

[3] Historically, the earliest cities each obtained a charter from the state—Rochester's first charter was granted in 1834 (New York State Division of Local Government Services, Revising City Charters in New York State 1-2 [2023], available at https://dos.ny.gov/publications). As cities multiplied, it became unwieldy for the legislature to pass laws for each city individually (*id.* at 2). At the Constitutional Convention of 1894, cities were divided into different classes by population to enable the legislature to pass laws that would cover multiple cities simultaneously (*id.*). This was the genesis of the second class city, town, and village laws, which consistently reflect the same state policy of local control visible in individual city charters (*see Schenectady*, 30 NY3d at 113).

Contrary to the majority's assumption, our police discipline cases create no requirement that a policy prohibiting bargaining must be embodied in a statute "in force," which would be a departure from the legal standard we apply to every other subject (majority op 7-8, quoting *PBA*, 6 NY3d at 571). *PBA* explicitly acknowledges that a policy prohibiting bargaining may exist "even where no statute explicitly says so" (*PBA*, 6 NY3d at 572). The opinion approvingly cites *Matter of Buffalo Police Benevolent Assn*, decided only the year before, in which we held that a commissioner of police could not collectively bargain away discretion over hiring because police hiring affects the "safety of the community"—a policy not embodied in any statute "in force" (*PBA*, 6 NY3d at 576, citing 4 NY3d at 664 [2005]). A state statute "in force" is a strong signal of state public policy, will generally be the way such policy is demonstrated, and is the way it was demonstrated in *PBA*. However, we cannot read "in force" to be a prerequisite to finding a State public policy when *PBA* explicitly articulates a contrary standard. In unusual cases, as we will see here, state policy may be clear even when a local statute is no longer in force.

The majority also indicates that the existence of a prohibition on bargaining hinges on whether Civil Service Law §§ 75 and 76 apply (majority opp 8-9, citing *PBA*, 6 NY3d at 573). As with the "in force" requirement, this confuses a relevant ancillary issue with the governing legal standard. Decades before *PBA*, we affirmed an Appellate Division decision, *Matter of Auburn*, observing that sections 75 and 76 of the Civil Service Law, which provide statewide disciplinary procedures for Civil Service employees, do not express a policy prohibiting bargaining over police discipline (*see Matter of Auburn Police*

*Local 195, Council 82, Am. Fedn. of State, County and Mun. Emp., AFL-CIO v Helsby*, 62 AD2d 12, 17 [3d Dept 1978], *affd* 46 NY2d 1034 [1979]).[4] *PBA* and subsequent cases distinguished *Auburn* by noting that due to the grandfathering clause in section 76(4), the procedures in sections 75-76 do not apply where a preexisting statute, such as the Town Law, controls police discipline. But after distinguishing *Auburn* in that way, our cases have always moved on to the ultimate ground of the analysis—whether there is a state policy prohibiting collective bargaining in the relevant location.

Because the majority never takes a step back to view the overall landscape of our Taylor Law jurisprudence, it confuses particular steps in our analysis of collective bargaining over police discipline with the governing legal standard. Without explanation, it departs from our general test for prohibited subjects of bargaining in favor of a new test that a subject we have previously deemed "prohibited" (*PBA*, 6 NY3d at 572) can remain

---

[4] *Auburn*'s holding is much more limited than the majority implies and is irrelevant here. *Auburn* is a one-line summary affirmance of an Appellate Division decision which reversed a PERB determination that the city was prohibited from bargaining around the provisions of Civil Service Law §§ 75-76 (46 NY2d 1034). PERB's position that bargaining was prohibited was based solely on Civil Service Law amendments stating that the Civil Service Law procedures could be modified, supplemented or replaced by agreements "between the state and an employee organization," which PERB interpreted as showing legislative intent to prohibit modification of such provisions by a city (*Auburn*, 62 NY2d at 16, quoting Civil Service Law § 76 [4]).  The Appellate Division holding was narrow, concluding only that PERB had failed to establish a reasonable basis for its determination, and no issue of public policy based on any charter or other source was raised (*id.* at 17). *Auburn*'s holding—that the amendment authorizing the state to enter into collective bargaining agreements did not bar localities from doing the same—does not bear on whether bargaining is nevertheless prohibited due to public policy derived from another statutory provision, decisional law, or other source.

prohibited only if 1) a statute that conflicts with the Taylor Law is in force and 2) sections 75-76 of the Civil Service Law are not applicable to that municipality. The majority's analytical method is merely an artefact of misreading our precedent—there is no reason police discipline should be analyzed differently from every other subject of bargaining. Although the difference will be unimportant when a municipality—even if it has engaged in years of collective bargaining[5]—has not taken the step of repealing a provision from its charter, as applied here it creates a result that bargaining is mandated where contrary to public policy, simply because that policy is not expressed in the manner familiar from our past cases.

## III.

Our previous cases have dealt with two state policies: the policy of local authority over police discipline and the policy of mandatory collective bargaining. We have held that the former is strong enough to overcome the latter. It is undisputed under our precedent that prior to 1985, Rochester could refuse to bargain collectively over police discipline. The question is whether Rochester's 1985 legislation, which repealed local charter provisions covering disciplinary process, also reversed the state policy calculus. The majority holds that it did, because state policy must be embodied in a statute in force, and once Rochester repealed its charter provision, the only statute in force was the Taylor Law.

---

[5] Of course, the mere fact that a municipality has collectively bargained a subject in the past does not determine whether such bargaining is appropriate under the Taylor Law (*see Wallkill*, 19 NY3d at 1068 [holding that although Wallkill has been bargaining over discipline for 12 years, it is a prohibited subject]).

However, the basis of the bargaining prohibition was not the formal text of Rochester's charter but the state policy it represented. That state policy of local control over police discipline is embodied not only in the Rochester charter, but also in the Second Class Cities Law, Town Law, Village Law, other city charters, and virtually every legislative grant to municipalities statewide. Rochester's charter identifies it as one of the many cities covered by that policy, and the state never took any action that would cause any doubt as to the dominant weight the state gives to that policy. A city may repeal its charter provisions, but state policy cannot change without state action. Because state policy still favors local authority over collective bargaining in Rochester, there is no requirement of mandatory collective bargaining under the Taylor Law that would conflict with Local Law No. 2-2019.  Indeed, local control over police discipline is not inherently inconsistent with collective bargaining over police discipline, so long as the decision to bargain collectively is made by the appropriate local authority and is revocable when the local authority no longer chooses to use that method to impose discipline.

This case also presents a third policy not considered by our precedent: the policy of municipal home rule. That policy does not alter but rather reinforces our conclusion that Local Law No. 2-2019 is valid.  Combining the policies of home rule and local authority suggests the state's overall policy is to grant local governments a free hand in matters of police discipline. Adding the policy of the Municipal Home Rule Law to the calculus of our precedent therefore supports Rochester's ability to choose to impose police discipline in the format it chooses, even via collective bargaining, and to retain freedom to switch

between formats so long as discipline remains under the control of local officials. No statute or state policy in play here can justify a result in which Rochester is irrevocably trapped in collective bargaining while numerous other municipalities may lawfully eschew it.

Our past decisions have already established that where the State has "specifically commit[ted] police discipline to the discretion of local officials," there is a "policy favoring the authority of public officials over the police" that overcomes the state policy of collective bargaining (*PBA*, 6 NY3d at 575-76). Here, the 1907 Rochester charter "commits police discipline to the discretion of local officials" (*id.*). The charter is a state law that gives the public safety commissioner the duty to create "rules and regulations…for the government, discipline, management, and direction of the police" and conduct disciplinary proceedings accordingly (1907 Charter of the City of Rochester §§ 324, 330). Thus, Rochester is one of the many cities, towns and villages the state identified as included in the broader state policy of strong local authority over police discipline, which according to our precedent reaches most of the municipalities in New York. Because of that provision, the parties do not dispute that before the 1985 local legislation, Rochester was covered by a state policy of official authority strong enough to displace the Taylor Law's presumption of collective bargaining.

The key question is whether Rochester's 1985 local legislation changed New York State's policy calculus. It did not because it could not. The 1985 Rochester legislation repealed the former charter provisions on police discipline and revised provisions on the

powers of the police commissioner. Rochester had the power to do so under the Municipal Home Rule Law, which allows it to supersede special laws (Municipal Home Rule Law § 10 [1] [i]). However, the supersession provisions of the Municipal Home Rule Law do not make the local law a state law, nor do they make the local policy state policy. State policy is derived from state statute and decisional law, and presumably also from executive orders, regulations, or other statements of official policy. But local governments cannot create or alter state policy—even if the state has authorized them to deviate from state law—and state policy therefore cannot be derived from local law. The majority cites no state action between 1967 and 2019 suggesting any weakening of the state's preference for local authority over collective bargaining, which admittedly existed at that time in Rochester and similar cities.

In fact, recent evidence suggests the policy of local authority over police discipline is stronger than ever. In response to the widespread protests following the death of George Floyd in 2020, Executive Order 203 instructed local governments to develop comprehensive police reform plans (*see* Executive Order 203, June 12, 2020). In response, "more than half the plans discussed civilian oversight and civilian review boards," and the state office created by the Executive Order held up several such planned boards as "innovative community initiatives" intended to inspire others (New York State Police Reform and Reinvention Collaborative, *Initial Report on Innovative Community Initiatives* at 12-13 [2021], available at https://policereform.ny.gov). Similarly, the Attorney General has taken a strong position that a city attempting to comply with the Executive Order should

"establish a civilian oversight entity…with subpoena power, structural independence, the power to conduct administrative prosecutions" and ideally, "final disciplinary authority over officers" (Letter from New York State Office of the Attorney General to the Honorable Byron W. Brown, Mayor of Buffalo, *Re: Buffalo Draft Resolution Pursuant to Executive Order 203*, March 25, 2021, at 2-3). Those recent state actions express approval of strong local oversight of police discipline that is consistent with the policy expressed in the Town Law, Village Law, Second Class Cities Law, and charters of cities like Rochester, but inconsistent with mandatory collective bargaining.

The majority's main objection to this line of reasoning is that state policy should be derived from a statute "in force," and the 1907 Rochester charter provision regarding police discipline is no longer in force (*PBA*, 6 NY3d at 572). Of course, the Town Law, Village Law, Second Class Cities Law, related charters, Executive Order 203, and all other sources of the state policy of local authority remain "in force." However, assuming that the argument is that the policy should no longer apply to Rochester because Rochester's specific statute is no longer in force, imposing such a requirement is entirely inapt where a municipality supersedes state law.

If the State repeals a statute, we presume that statute no longer reflects state policy— rather, state policy is reflected by the decision to repeal. Therefore, deriving state policy from the repealed statute would be unreasonable. However, that logic does not apply where State legislation is repealed by a city under the Home Rule Law. In such a case, state policy is reflected by the original legislation, and only local policy is reflected by the local law

"in force." If the original legislation expressed a policy of local authority that included Rochester, the fact that the statute was superseded by local action does not reflect a change in the state's policy. The local legislature may have the power to amend state statutes relevant to its location, but it does not have the power to change a state policy determination. Because state policy still demands that the collective bargaining mandate of the Taylor Law bend to Rochester's exercise of local authority over police discipline, Local Law No. 2-2019 is valid.

Considering the policy of the Municipal Home Rule Law only strengthens this conclusion. Focused on resolving the "tension" between the policy of collective bargaining and the policy of strong disciplinary authority (*PBA*, 6 NY3d at 571), we have not previously confronted how the policy of municipal self-government impacts this balance. Put simply, the policy of the Municipal Home Rule Law is that the State will defer to cities on many affairs related to their property, affairs, and government. As applied to the Taylor Law, it may be state policy to defer to municipal decisions on the application of the Taylor Law to local government and affairs. Where our prior precedent stated that the policy of strong disciplinary authority outweighs the policy of collective bargaining on the scales of state policy, the policy of home rule suggests that a city should be able to put a thumb on either side of the scale.

Analogously, we held in *Matter of Buffalo Police Benevolent Assn* that public policy prevented the police commissioner from waiving his statutory discretion over the selection of police officer candidates through collective bargaining, but at the same time implied that

he could waive such discretion if there were "compelling evidence that the Commissioner made a conscious choice to do so" (4 NY3d at 664). Thus, we suggested that in some cases where a subject of bargaining would normally be prohibited by public policy, the state should defer to a clear local choice to the contrary. As applied here, if Rochester made a clear decision to bargain or not to bargain over police discipline, state policy would be to defer to that decision.

As discussed further below, Rochester did not express any clear intent here to submit to mandatory collective bargaining. But more crucially, even if Rochester did decide to impose police discipline through a collectively bargained procedure, by the same logic it would be able to change that decision later on. Nothing about the policy of the Municipal Home Rule Law changes the holding of our precedent that at baseline, the state's policy favoring local authority over police discipline can overcome the policy of the Taylor Law. Instead the state's policy favoring home rule bolsters the ability of municipalities to choose to impose police discipline through a variety of methods, with local governments determining what methods best suit the needs of the day.

Rochester's 1985 enactment did not change state policy with respect to the application of the Taylor Law. Although Rochester effectively repealed the state law, that repeal did not alter the state's policy preference for local control over police discipline even as to Rochester; that policy is demonstrated by the state enactments, not the local statute "in force" at some particular point in time. Adding respect for home rule to the policy calculus set out in our precedent only reinforces the conclusion that discipline should

remain a prohibited subject of bargaining under the Taylor Law where the local government supports the state policy of local authority over police discipline and the only contrary policy comes from a discarded local law.

IV.

Bargaining remains prohibited in Rochester for an additional reason. Although, as explained above, Rochester should be able to opt out of collective bargaining under the Taylor Law even if it at one point opted in, here, Rochester never opted in with sufficient clarity to overcome the state policy that favors local control of police discipline over the mandatory bargaining of the same.

Our caselaw interpreting the Home Rule Law emphasizes the need for clarity and specificity when a local government seeks to supplant a state law (*see Turnpike Woods, Inc. v Stony Point*, 70 NY2d 735 [1987]; *Kamhi v Yorktown*, 74 NY2d 423, 434-435 [1989]). Consequently, we should not conclude lightly or "by implication" that a municipality has chosen to abdicate its authority over police discipline in favor of collective bargaining (*Turnpike Woods*, 70 NY2d at 738). This is especially true if we believe that this action is irreversible and will forever bind the hands of future local legislatures or the overwhelming decision of the local voters, as the majority's holding requires.

Local Law No. 2-1985 lacks a sufficiently clear statement showing Rochester's intent to abandon local control over police discipline. Collective bargaining is not explicitly mentioned in the 1985 law, nor does the legislative history show any intent to address collective bargaining. Instead, the repeal of the disciplinary procedures in the charter

appears to have been a "housekeeping" measure taken in the context of a larger restructuring of Rochester's public safety organization. Rochester had already been collectively bargaining over discipline for at least nine years, and the bargaining agreement incorporated Civil Service Law §§ 75-76. The text of the 1985 enactment merely repeals the charter section titled "Charges and trials of policemen," which was already unused under the collective bargaining agreement. Therefore, the 1985 repeal did not change the status quo in Rochester regarding police discipline. The reason given for repeal—"that this subject matter is covered in the Civil Service Law"—could readily be understood as a reference to the procedural aspects of Civil Service Law §§ 75-76, which already governed police discipline in the City, rather than an attempt to address the status of collective bargaining.

Moreover, Local Law No. 1-1985 retained broad grants of authority in the commissioner of public safety and chief of police. The commissioner has "the power of an appointing officer," may "issue subpoenas, administer oaths, and take affidavits" and make "rules and regulations" for how employees should be assigned, stationed, and transferred (Local Law No. 1-1985 § 5). The chief of police "shall have control of administration" of the police department, must ensure that rules and regulations are "enforced and carried out," and generally must perform "other duties as prescribed by law or ordinance or assigned by the Commissioner of Public Safety" (*id.* § 6). The Chief also has the same subpoena and oath powers as the Commissioner (*id.*).

When Rochester repealed the disciplinary procedures in its previous charter, new disciplinary procedures presumably replaced them. However, other than vesting numerous powers in the Commissioner and Chief of Police, the 1985 laws contain no specifics as to whether disciplinary procedures would come from the Civil Service Law (without collective bargaining), the Taylor Law, or the general authority of the commissioner and chief of police. Given that silence, the preexistence of collective bargaining even when police discipline was a prohibited subject, and the general importance of the State's public policy to place discipline within the control of local authorities, we should not assume that Rochester intended to cede its control over police discipline.  In the absence of a clear statement to the contrary, we should assume that bargaining over discipline remained prohibited in Rochester.

V.

Because the majority concludes that the Taylor Law governs police discipline in Rochester, its discussion in section V, addressing the Locust Club's alternative arguments, is dicta.  However, because I have concluded that the Taylor Law does not control collective bargaining over police discipline in Rochester, I must address the Locust Club's alternative arguments, which I conclude are without force.

The only alternative ground credited by the Appellate Division was that the Local Law No. 2 conflicts with the 1907 Charter (*Rochester Police Locust Club, Inc. v City of Rochester*, 196 AD3d 74, 83-84 [4th Dept 2021]). The argument is that if the 1907 Charter expresses a state policy of strong disciplinary authority in local officials that prohibits

collective bargaining, such a policy should also prohibit taking authority from the chief of police and placing it in an appointed commission.

First, state policy would not have the same effect on a local law as it would on the application of the Taylor Law. The policy of the 1907 charter is relevant to our Taylor Law analysis because the application of the Taylor Law depends on state policy. However, there is no general rule that a municipality may not take actions contrary to state policy. Under the Home Rule Law, Rochester can repeal its 1907 charter and replace it with a new regime so long as the new regime is not inconsistent with any general law.

A better phrasing of the argument might therefore be that if Rochester repealed its 1907 charter and replaced it with Local Law No. 2, the prohibition on bargaining would end and Local Law No. 2 would conflict with the general bargaining mandate of the Taylor Law. The key premise of that argument is that a policy of "strong disciplinary authority" in local officials generally is not sufficient to prohibit collective bargaining—rather, disciplinary authority must be vested specifically in elected, or possibly executive officials (196 AD3d at 83). Because Local Law No. 2-2019 vests disciplinary authority in unelected municipal officials outside of the Police Department, mandatory bargaining under the Taylor Law should apply. The concern seems to be at least partly with preserving a clear chain of command—our precedent rooted the policy of strong disciplinary authority in the "quasi-military" nature of the police force, and Local Law No. 2-2019 could be understood to dilute the chain of command by placing authority in a board appointed largely by the City Council (*PBA*, 6 NY3d at 576).

However, I do not read our precedent to rest on the maintenance of a militaristic chain of command. Our precedent covers both police commissioners and Town Boards, and makes no mention of whether officials are elected or unelected. Although *PBA* quoted an 1888 case stating that police discipline should rest "wholly in the discretion of the commissioners," even *PBA* itself quickly qualified this proposition by holding that bargaining was also prohibited when control over police discipline is placed with the Town Board (*PBA*, 6 NY3d at 576, quoting *People ex rel. Masterson v. French*, 110 NY 494, 499 [1888]; *see also Wallkill*, 19 NY3d at 1068). Moreover, we accepted in *Schenectady* that authority can be moved between a police chief, commissioner of public safety, and other local officials without violating an SCCL provision similar to the Rochester Charter (*see Schenectady*, 30 NY3d at 115 n 1). Our cases have not generally stated that bargaining is prohibited because of the need to preserve a direct chain of command, but due to a more general policy of preserving "official authority over the police" (*PBA*, 6 NY3d 576), "local control over police discipline" (*Schenectady*, 30 NY3d at 117); or "strong disciplinary authority for those in charge of police forces" (*Wallkill*, 19 NY3d at 1069, quoting *PBA*, 6 NY3d at 571).[6]

Moreover, it makes sense as a matter of policy that whether bargaining is prohibited under the Taylor Law should not depend on whether discipline is vested in a particular type

---

[6] Notably, this last mention of "those in charge of police forces" referred to the Town Board, even though towns may also appoint police commissioners and a police chief (*see* Town Law § 150). It was no obstacle to our holding in *Wallkill* that the day-to-day commander of police differed from the responsible disciplinary body.

of official. The principle behind the prohibition on bargaining is that collective bargaining

dilutes the ability each local government to determine what form of disciplinary authority

is needed to preserve the "safety of the community" (*PBA*, 6 NY3d at 576, quoting *Buffalo*

*Police Benevolent Assn*, 4 NY3d at 664). If a police officer is participating in conduct that

endangers the safety of the community, it is important that the officer be removed or

appropriately disciplined rather than allowed to repeat the conduct (*see generally* Stephen

Rushin, *Police Arbitration*, 74 Vanderbilt L Rev 1023, 1065-1069 [2021] [finding that

arbitrators' "tendency towards compromise" has resulted in unfit officers—for example,

officers who challenged persons in custody to fist fights or offered homeless individuals

sandwiches filled with dog feces—being reinstated to duty]). There is no reason to believe

that a process internal to the police department would be able to provide a robust

disciplinary response where an external municipal commission would not. In fact,

Rochester's action in establishing the PAB evidences strong local disapproval of the

preexisting, collectively bargained police disciplinary processes—hardly unique in the

wake of recent attention paid nationwide to thousands of police killings of unarmed

persons.

Here, the members of the Rochester PAB are local officials appointed by the City

Council. Rochester has chosen to vest power in those local officials, rather than the police

chief, mayor, or city council itself, because it believes that doing so is the best way to

strengthen "local control over police discipline." (*Schenectady*, 30 NY3d at 117). That

action is consistent with state policy, and there is no reason our Taylor Law analysis should apply differently to Rochester's regime than to those in *PBA*, *Wallkill*, or *Schenectady*.

The Locust Club also argues that Local Law No. 2-2019 conflicts with Civil Service Law §§ 75-76 and Unconsolidated Law § 891, which mandate that disciplinary proceedings be heard by the "officer or body having the power to remove the person charged." Even assuming that Local Law No. 2 must be consistent with those laws, I agree with the Appellate Division that it is, for the same reasons cited in the decision below. Although the police chief is required to sign off on discipline, in substance the PAB has the power to remove the person charged. Although a snippet of the majority opinion might be read to suggest that Rochester Local Law No. 2-2019 is barred by sections 75-76 (majority op at 9), no reasoning or elaboration is provided. I therefore understand the force of the majority's decision to be that Rochester Local Law No. 2-2019 conflicts with the Taylor Law, not with Civil Service Law §§ 75-76.

VI.

The majority holds that because Rochester passed a law that arguably relinquished local control over police discipline in 1985, Rochester must now continue with collective bargaining even if it is inconsistent with state public policy, local public policy, and the will of the vast majority of Rochester's citizens who daily are protected by and subjected to the conduct of its police force. The result resembles an odd game of rock-paper-scissors. A state law favoring strong disciplinary authority beats the Taylor Law, municipal law beats a policy of strong disciplinary authority, but the Taylor Law beats municipal law.

Unless the state legislature now affirmatively steps in, the majority has implemented a one-way ratchet where a city can move from the more favored state policy to the less favored one, but never back.

Fortunately, the legislature has the power to break the cycle. As we have recently seen, the legislature monitors our holdings on state bargaining policy and is equipped to modify or clarify them as needed (*see* L 2022, ch 674 [announcing the policy of the state that firefighters not be exempt from collective bargaining over discipline under the Taylor Law]). Here, Rochester's attempt to strengthen police oversight emerged from protests over police misconduct that have also resonated in the halls of our state government (*see* Executive Order 203, June 12, 2020 [instructing local government entities to review current practices to foster police trust and legitimacy]; L 2020, ch 96 [repealing laws restricting access to police disciplinary records]). If Rochester's desire to establish an independent disciplinary commission is in fact consistent with state policy, the legislature may easily correct our error. Otherwise, someone will have to explain to the people of Rochester why they cannot vote to rein in police misconduct while both New York City and the Town of Wallkill may.

Order insofar as appealed from affirmed, with costs. Opinion by Judge Egan Jr. Judges Garcia, Singas and Cannataro concur. Chief Judge Wilson dissents in an opinion, in which Judges Rivera and Halligan concur. Judge Troutman took no part.

Decided November 20, 2023